**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**Tioronda, LLC.,**
**Plaintiff**

v.

**State of New York,**
**George E. Pataki,** *in his official capacity*
*as Governor of the State of New York*,
**Joseph H. Boardman,** *in his official*
*capacity as the Commissioner of the*
*Department of Transportation of the*
*State of New York*,
**Defendants**

04 Civ. 7357 (SCR)

MEMORANDUM DECISION
AND ORDER

---

This case presents the question of whether the abbreviated procedure by which New York law permits the State of New York to take private property comports with constitutional due process requirements. After considering, and ultimately rejecting, Plaintiff's claims to be entitled to additional opportunities to be heard not now guaranteed by New York's Eminent Domain Procedure Law, the court finds that Plaintiff's claim to be entitled to additional notice has a likelihood of success on the merits.

**I.     Background**

    **A.  Factual History**

        **i.  The Property To Be Taken By Eminent Domain**

Tioronda, LLC (the "Plaintiff" or "Tioronda") is a limited liability corporation organized under the laws of the state of New York. Its place of business is in the City of Beacon, Dutchess County, New York

George E. Pataki ("Pataki") is the Governor of the State of New York. Joseph H. Boardman ("Boardman") is the Commissioner of the Department of Transportation for the State of New York (Pataki, Boardman and the State of New York are collectively referred to herein as "Defendants").

The Plaintiff acquired the Tioronda Estate (the "Property"), including the Tioronda House and its sixty-eight acre estate in the City of Beacon, from the Craig House Sanitarium in May 2003.[1] The Property is bounded on the west by Fishkill Creek, on the east by New York State Route 9D and on the south by Grandview and South Avenues. Adjoining the Property to

---

[1] Defendants contend that Plaintiff purchased the property on or about July 24, 2003. The discrepancy is not relevant to the questions before this court.

the north is a subdivision called Eastlyne. The City of Beacon owns a drainage easement that abuts the Property along the border of Eastlyne and ends at Fishkill Creek.

The Property was the original estate of General Joseph Howland, who constructed the home that sits on the Property in 1859-60. While Howland was actively engaged in the Civil War, Henry Winthrop Sargent, a noted gardener and horticulturalist, landscaped the estate and, in doing so, planted several rare trees. In the early 1980s, the Property was designated by the New York State Office of Parks, Recreation and Historic Preservation ("OPRHP") for listing on the New York State and National Register of Historic Places. One of the features of the Property that is still in existence is a historically and horticulturally significant tree known as a Sargent's Weeping Hemlock.

Before acquiring the Property, Tioronda learned that the drainage system in place for the Eastlyne subdivision emptied onto the Property, rather than into Fishkill Creek. The drainage has created a thirty-foot deep and sixty-foot wide gully on the Property and the soils that are downstream of the drainage pipe have been rapidly eroding.

Tioronda was aware, at the time it acquired the Property, that the New York State Department of Transportation ("DOT") was planning to reconstruct part of Route 9D bordering on the Property ("Project"), and that part of the Project involved the State taking a drainage easement and turning the raw, eroded gully into a constructed drainage channel. The Project is estimated to cost $6.5 million, of which eighty percent will be paid by the Federal Highway Administration ("FHWA") and twenty percent will be paid by the City of Beacon. The State, however, agreed to reimburse the City of Beacon for three-quarters of its twenty percent share, leaving only five percent as the effective local share of the costs.

The DOT's drainage plan involves the construction of a new drainage pipe that would run along the edge of the Eastlyne subdivision and the acquisition of the portion of the Property that is adversely affected by the drainage flow ("Acquired Land"). The plan also includes the construction of a new stone-lined ditch where the previous landscapers had placed a grassy swale for drainage. The drainage plan proposed by the DOT would, according to Plaintiff, do irreversible damage to the roots of the Sargent's Weeping Hemlock tree and cause harm to federally-protected wetlands on the Property not taken by the State.

John Stewart, the Managing Director of Tioronda ("Stewart"), retained an environmental engineering firm, Stearns & Wheler, LLC, to examine the existing and proposed drainage systems and determine whether a drainage system better than the one proposed by the DOT could be constructed. Stearns & Wheler examined three alternative designs and, based on ease of implementation and minimal environmental impact, preferred a system involving continuing the line along the existing municipal easement and discharging the water into an existing drainage system within the Eastlyne subdivision. This proposed system would bypass the Property entirely.

### ii. Summary Of Applicable New York Law

Article 2 of New York's Eminent Domain Procedure Law ("EDPL") sets forth the procedures that most condemnors must follow prior to acquiring property. Specifically, it requires condemnors to hold a hearing to review the public use of the project and its impact on the environment. *See* EDPL §201. Further, the EDPL requires that condemnors give notice of the hearing by publication and, since January of 2005, has required that the effected property

owner be given individualized notice, either by personal service or certified mail. *See* EDPL §202.

Within ninety days of the conclusion of public hearings, condemnors are also required to publish their determinations and findings, *see* EDPL §204(A), which triggers an exclusive thirty-day period in which such determination and findings may be appealed. *See* EDPL §207. Recent amendments to the EDPL also require that individuals whose properties are being condemned also be given individualized notice of both the publication of the determination and findings and the thirty-day time limit on judicial challenges thereto. *See* EDPL §204(C).

Crucially, however, the EDPL also contains special provisions that allow the State of New York[2] to begin and end eminent domain proceedings without holding an adversarial proceeding or providing the condemnee some of the other procedural protections required by Article 2 ("Special Procedure"). State agencies may resort to the Special Pocedure under various conditions described in EDPL § 206, including when the condemnor "pursuant to other state, federal, or local law or regulation …considers and submits factors similar to those enumerated in subdivision (B) of section two hundred four,[3] to a state, federal or local governmental agency, board or commission before proceeding with the acquisition and obtains a license, a permit, a certificate of public convenience or necessity or other similar approval from such agency, board, or commission…." EDPL §206(A). The Special Procedure is also available when "in the opinion of the condemnor the acquisition is de minimis in nature so that the public interest will not be prejudiced by the construction of the project…." EDPL § 206(D).[4]

Under the Special Procedure, the State must institute proceedings within three years of the date of the order or completion of the procedure that constitutes the basis for exemption under section two hundred six. *See* EDPL § 401(A). Crucially, section 402(A) of the EDPL details the procedures that the State must follow after obtaining the necessary approvals. Notably, that section requires that the State do only three things in order for the property to vest: (1) file the original tracing of the acquisition map in the main office of the agency, department, or authority for which the acquisition is being made (2) notify condemnees by first class mail that the condemning party is now taking steps to acquire such property and that the "people of the state of New York, their officers and agents may immediately enter upon and take possession of the real property so described for any and all purposes connected with the proposed public project"; (3) file a certified copy of such acquisition map in the office of the county clerk or register of each county in which such property or any portion thereof is situated. *See* EDPL

---

[2] More accurately, this procedure is available to any entity subject to jurisdiction in the New York Court of Claims. *See* EDPL §402(A). Because this case involves only the State of New York, the class of entities subject to Court of Claims jurisdiction is collectively referred to herein as the "State."

[3] The factors enumerated in this subdivision include (1) the public use, benefit or purpose to be served by the proposed public project; (2) the approximate location for the proposed public project and the reasons for the selection of that location; (3) the general effect of the proposed project on the environment and residents of the locality; (4) such other factors as it considers relevant. *See* EDPL § 204(B).

[4] The State's statutory authority to acquire property for the purpose of constructing, reconstructing or improving a state highway or property connected with such highway projects is set forth in New York's Highway Law. The Highway Law provides that such property "may be acquired by the state as provided in the eminent domain procedure law." *See* HIGH § 30(1)(a). Before a property is condemned, the Commissioner of Transportation must order the preparation of an accurate acquisition map of the property deemed necessary for the project. *See* HIGH § 30(3). Once the Commissioner approves the acquisition map, "he shall acquire such property…pursuant to the eminent domain procedure law." HIGH § 30(3).

§402(A). Notably, the acquisition of the property by the State is deemed complete and title is vested in the state as soon as the map is filed with the county clerk. *See* EDPL §402(A)(3).

### iii. The Condemnation Proceedings In This Case

On March 31, 2003, prior to the Plaintiff's purchase of the Property, Stewart had a meeting at Craig House, which was attended by the Mayor of the City of Beacon, representatives of Craig House, local environmental groups, and Carolyn Ryan, DOT's Project Engineer. Ryan gave Stewart the Project's drainage plans, which Stewart accepted after the DOT agreed to make some changes.

On June 5, 2003, Ryan faxed to Stewart's then counsel the permanent and temporary easement descriptions for the acquisitions from the Property and a copy of the DOT publication "How The State Acquires Property for Public Purposes, A Guide For Property Owners." The pamphlet summarizes, in non-technical language, the process by which the State takes private property through eminent domain, and also includes a paragraph summarizing the Special Procedure provided for by EDPL §402(A). Specifically, it states:

> When it is necessary for the Department to acquire private property, a map is prepared which shows in detail the extent of right of way needed from each property. Title to the private property required is vested or transferred to the State when a copy of the map is filed in the office of the County Clerk for the county where the property is located. However, before any transfer of title takes place, you will receive a copy of the map, thorough explanation of the acquisition and a firm offer of compensation in writing.

Under both the National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321, *et. seq.*, and the State Environmental Quality Review Act ("SEQRA"), Environmental Conservation Law, Article 8, it is necessary to determine whether the predicted environmental impacts of any project are significant enough to require full-fledged environmental review procedures or minor enough to allow more expeditious consideration. *See East Thirteenth St. Community Ass'n v. New York State Urban Dev. Corp.*, 641 N.E.2d 1368, 1372 (N.Y. 1994) (judicial review of condemnation proceedings includes review of whether the condemnor's determination was in accord with SEQRA requirements), citing EDPL § 207.

In this case, DOT determined, and the FHWA concurred, that the Project qualified as a Class II Categorical Exclusion under the FHWA's NEPA regulations, 23 C.F.R. § 771.117(d)(1), and would not cause environmental impacts sufficient to require preparation of an environmental impact statement. DOT also determined that, under the analogous SEQRA regulations, the project qualified as a Type II action, and therefore did not require further review. 17 N.Y.C.R.R. § 15.14(e)(37). In addition to these determinations, however, the City of Beacon's independent assessment and agreement was necessary.

On October 27, 2003, Ryan met with the Beacon City Council to review final plans in preparation for a vote then scheduled for November 3, 2003. Stewart and his then-counsel attended the meeting and presented objections to any approval by the City Council of the Project. Ryan gave Stewart's counsel a package containing drainage details, plans, hydraulic calculations for the north drainage ditch, and a watershed map. Two days later she submitted a copy of the final design report to Stewart's counsel and, five days later, sent cross-sections of the two drainage ditches.

On November 5, 2003, members of DOT's design, construction and landscape teams met with representatives of Plaintiff, the City of Beacon and the OPRHP to discuss the Project and inspect the property in question. Changes to the DOT's plans were agreed to and subsequently made.

On December 22, 2003, the City of Beacon conducted a workshop meeting at which it considered two resolutions: 1) approving DOT's determination that the Route 9D project, including the new drainage system to be installed on the Property, was a "Type II" action pursuant to SEQRA; and 2) approving DOT's final plan for the Route 9D project. Immediately after the workshop, the City of Beacon rejected, by a vote of 4-2, DOT's determination that the Route 9D project was a Type II action.

On January 14, Robert Dennison, the DOT's Regional Director, in response to the City's rejection of its determinations, sent the Mayor a letter explaining the City's options for making drainage plans at its own expense. Dennison explained in the letter that, should the City refuse to pass a resolution endorsing the Project, the DOT would seek reimbursement from the City for the DOT's unpaid costs, which amounted to $1.3 million.

On February 2, 2004, the City adopted a resolution reversing its previous decision and agreeing to classify the Project as a Type II action. At the same time, the City adopted a resolution approving the DOT's design proposal.[5]

In response to this decision, the Plaintiff did not bring an Article 78 proceeding to challenge the City of Beacon's decision to designate the Project as "Type II" Action. Apparently expecting that eminent domain proceedings would be brought pursuant to Article 2 of the EDPL, which allows for notice and judicial review, rather than the Special Procedure provided by EDPL §402, the Plaintiff did not bring an Article 78 proceeding within the applicable four-month statute of limitations, which expired on June 2, 2004. Even though, according to Plaintiff's own account, it employed competent and sophisticated counsel throughout the process, it claims to have been absolutely unaware that its failure to file a timely challenge to the City's decision would result in the taking of its property without any opportunity for an adversarial proceeding or judicial review.

Pursuant to EDPL §402(A), on June 9, 2004, a week after the expiration of the statute of limitations to file an Article 78 proceeding, the DOT sent Plaintiff a letter by first class mail informing Tioronda that the DOT was taking steps to acquire the property and enclosing a package containing a proposed offer of compensation. At a July 26th meeting with a DOT representative, Tioronda learned that the DOT had filed acquisition maps with the Dutchess County Clerk on July 19, 2004, thereby vesting title in the State. On September 27, 2004, the DOT sent a letter, notice of appropriation, and maps notifying the Plaintiff that the acquisition had been made effective and advising of the three-year statute of limitations for bringing a Court of Claims proceeding.

Plaintiff does not appear to be arguing that the Defendants failed to comply with its obligations under §402. Rather, it claims that the procedure by which they took Plaintiff's property violated its procedural and substantive due process rights.

---

[5] The City did, however, require that the DOT make one change to its proposed plan: that the DOT utilize and replace a portion of the existing pipe and easement in the Eastlyne subdivision as part of the drainage system.

### B. Procedural History

In September 2004, the Plaintiff brought this action, pursuant to 42 U.S.C. §1983, to challenge on due process grounds the procedures that were followed in taking its property by eminent domain.

In October 2004, the Plaintiff filed a motion for a preliminary injunction to stop the state from implementing its planned drainage system, and thereby altering the property in the manner described in the maps filed with the Dutchess County Clerk.

In its motion, Plaintiff claims that the taking of his property violated his due process rights in several ways: 1) by failing to provide an adversarial proceeding to determine whether New York State was exempt from the procedural requirements of Article 2 of the EDPL; 2) by failing to provide an opportunity for judicial review of that determination; 3) by failing to provide an adversarial proceeding to determine whether New York State has the authority to take Tioronda's property by eminent domain; 4) by failing to provide an opportunity for judicial review of that authority; 5) by deciding to use municipal approvals from the City of Beacon as a basis for exempting itself from Article 2's procedural requirements without notifying Plaintiff of that decision; 6) by failing to notify Plaintiff that a timely challenge to the resolutions adopted by the City of Beacon was the only mechanism by which it could possibly prevent the taking of its property.

For reasons described below, Plaintiff has established irreparable harm and a likelihood of success on the merits with respect to one of its claims and, as such, Plaintiff's motion for preliminary injunction must be granted.

## II. Analysis

### A. Applicable Standard

A party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) a likelihood of success on the merits. *See, e.g., NAACP v. Town of E. Haven*, 70 F.3d 219, 223 (2d Cir. 1995).[6]

### B. Irreparable Harm

Plaintiff argues that damage to the Sargent's Weeping Hemlock tree and other wetlands on the Property constitutes irreparable harm that will result in the absence of injunctive relief. Defendant responds that such damage could not constitute irreparable harm, because the property has already been taken and, although Plaintiff is undoubtedly entitled to reasonable compensation, there are no legal grounds to undo the taking and force title to be transferred back to the Plaintiff.

The court disagrees. The deprivation of an interest in real property constitutes irreparable harm, *see Carpenter Technology Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999), and irreparable harm cannot be remedied by an award of compensation or a monetary reward. *See Minnich v. Gargano*, 2001 U.S. Dist. LEXIS 372, at*16 (S.D.N.Y. 2001).

---

[6] The balance of hardships alternative to a showing of a likelihood of success on the merits is not available here as plaintiffs "seek[] to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *See Carpenter Technology Corp. v. City of Bridgeport*, 180 F.3d 93, 98 (2d Cir. 1999).

The fact that the state has already taken title to the property at issue here does not necessarily undermine Plaintiff's showing of irreparable harm. In *Brody*, the Second Circuit stated that the condemnee "is entitled to a return of his property only if he can prove that any denial of due process made a difference in the condemnation proceedings." 345 F.3d at 120-21. This statement makes clear, contrary to Defendants argument, that reconveyance is a possible remedy, at least under some circumstances.[7]

As such, permanent damage to rare and horticulturally significant trees is irreparable harm that is sufficient to warrant relief on a preliminary injunction motion.

### C. Likelihood Of Success On The Merits

#### i. Background

An essential principle of due process is that a deprivation of life, liberty, or property must "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). In this case, Plaintiff argues that both the opportunity to be heard and notice required by the Special Procedure are constitutionally deficient.

After first considering, and ultimately rejecting, Plaintiff's specific objections to the opportunities to be heard guaranteed by the EDPL, the court then finds that the notice requirements applicable to takings by the State are constitutionally inadequate.

#### ii. Opportunity To Be Heard

A state's eminent domain power to condemn property for a public purpose is indisputable and long established. *See State of Georgia v. City of Chattanooga*, 264 U.S. 472, 480 (1924) ("The power of eminent domain is an attribute of sovereignty, and inheres in every independent state."). *North Laramie Land Co. v. Hoffman*, 268 U.S. 276, 284 (1925), ("[T]he necessity and expediency of the taking of property for public use are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment.").

Although the Supreme Court has held that a state's eminent domain power is both an indisputable aspect of sovereignty and, at least in some respects, a purely legislative function, the Court has indicated that individuals whose properties are taken are entitled to some judicial process. In *State of Georgia*, for example, the Court presumed that the city would afford an owner the opportunity for a judicial proceeding regarding the authority of a city to condemn,

---

[7] Moreover, to the extent Plaintiff must also demonstrate that the denial of Plaintiff's due process made a difference in the proceedings, there is, at this stage, adequate facts to indicate that Plaintiff is at least likely to be able to do so. As Plaintiff points out, in order for a project to be designated a Type II action, there must be "no effect on any district, site, building, structure or object that is listed, or may be eligible for listing, on the National Register of Historic Places...." 17 NYCRR § 15.14(d)(6). In this case, Plaintiff has offered an affidavit that raises questions about the State's (and later City of Beacon's) apparent determination that there would no such effect in this case. This, coupled with the City of Beacon's initial finding that the Project did not qualify as a Type II action, and its subsequent reversal of that decision after the State threatened severe financial penalties, is sufficient to demonstrate a likelihood of success at this stage.

7

whether the taking served a public purpose,[8] and the amount of compensation.[9] *See State of Georgia*, 264 U.S. at 483.

Similarly, in *North Laramie Land Co.*, the Court approved a summary procedure without much in the way of due process protections, but did so with the caveat that owners must have a "reasonable opportunity" to protect their property from "an arbitrary or unjust appropriation." 268 U.S. at 283. Specifically, the Court in *North Laramie* drew a distinction between issues related to the "necessity and expediency" of the taking of property, which are legislative questions, and the issue of compensation for the taking, for which due process requires that the owner be given opportunity to be heard, upon reasonable notice of the pending proceedings. *See North Laramie Land Co.*, 268 U.S. at 284-85.

In sum, therefore, the Court has indicated that property owners are entitled to some form of judicial hearing regarding the authority of a state subdivision (i.e. a city) to condemn, whether a taking serves a public purpose, and the amount of compensation, but not with respect to the condemnor's determination as to the "necessity and expediency" of the taking. Moreover, property owners are entitled to judicial process necessary to protect against an "arbitrary and unjust appropriation," at least to the extent that this concern constitutes a basis for a judicial hearing separate and apart from those mentioned above.

Notably, while the Court in *North Laramie* did not consider the due process requirements for the determination of a public purpose, subsequent Supreme Court case law makes clear that "necessity and expediency" is distinct from "public purpose." The Court spelled out the distinction in *Berman v. Parker*, 348 U.S. 26, 33 (1954). In that case, the Court noted that once the object to be condemned is established to be within the authority of the legislature, the means by which it will be attained is solely for the legislature to determine. *See Berman*, 348 U.S. at 33. Specifically, once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch. *See id*. at 35-36.

Although Supreme Court precedent therefore suggests that property owners are entitled to some opportunity to be heard prior to a taking, Plaintiff has, in this motion, made two specific requests for adversarial hearings and judicial review, neither of which are persuasive. As discussed, Plaintiff argues that the failure to provide either an adversarial hearing or judicial review to determine two issues—whether New York State has the authority to take Tioronda's property by eminent domain and whether New York State was exempt from the procedural requirements of Article 2 of the EDPL—constitutes a due process violation.

Plaintiff's claim to be entitled to a hearing to determine whether New York State has the authority to condemn Tioronda's claim is easily disposed of. As mentioned, the power to take property by eminent domain is both an aspect of state sovereignty and a legislative function. *See e.g.*, *State of Georgia*, 264 U.S. at 480; *North Laramie Land Co.*, 268 U.S. at 284. Due process does not require that a property owner have either a hearing or an opportunity for judicial review to challenge a state's right to exercise one of its sovereign, legislative powers.

Nor does due process entitle Plaintiff to an adversarial hearing or judicial review to determine whether New York State is exempt from the procedural requirements of Article 2 of the EDPL. It is undoubtedly the case that property owners are entitled to certain due process

---

[8] The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one. *See Berman v. Parker*, 348 U.S. 26, 32 (1954).
[9] In this case, Plaintiff is not challenging the compensation he has been offered or the adequacy of the procedure by which the issue of compensation has been or will be resolved.

8

protections when their property is condemned. *See, e.g.*, *State of Georgia*, 264 U.S. at 483. But their entitlement to certain procedural protections does not imply a right to contest the process by which the state proceeds to condemn their property. The state can proceed by any statutory framework it wishes, so long as it meets the minimal requirements of due process. The fact that property owners are entitled to a hearing to determine certain aspects of the condemnation process does not entitle them to a hearing to determine which procedural protections they will receive.[10]

### iii. Notice

In its motion for preliminary injunction, Plaintiff claims that the Defendants denied it due process in two ways: by failing to notify Plaintiff that a timely challenge to the resolutions adopted by the City of Beacon was the only mechanism by which it could possibly prevent the taking of its property; and by failing to notify Plaintiff of its intention to utilize municipal approvals to take Plaintiff's property by the Special Procedure. The court finds that, although Plaintiff had no due process right to be notified of available appellate procedures and applicable statutes of limitation, due process likely does require that a property owner be given notice of the State's decision to use municipal approvals as a basis for exempting itself from Article 2's procedural requirements.

#### 1. Land Owners Have No Due Process Right To Notice Of Applicable Appellate Procedures And Statutes Of Limitations

The notice requirement is satisfied by "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.

Crucially, notice that satisfies *Mullane* need not specify applicable appellate procedures or statutes of limitations, because "[a]ll persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them…." *North Laramie Land Co.*, 268 U.S. at 283. *See also City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999) (Due process does not require "individualized notice of state-law remedies which…are established by published, generally available state statutes and case law."). This is "especially the case with respect to those statutes relating to the taxation or condemnation of land" because such statutes are "universally in force and are general in their application, facts of which the land owner must take account in providing for the management of his property and safeguarding his interest in it." *North Laramie Land Co.*, 268 U.S. at 283.

Plaintiff's claim to be entitled to be notified that a timely challenge to the City of Beacon's resolutions was its only mechanism by which it could prevent the taking of its property is unpersuasive. As discussed, property owners have no due process right to be notified of the provisions of applicable statutes and the procedure adopted by them. *See North Laramie Land*, 268 U.S. at 283. Sections 206, 401 and 402 of the EDPL set forth the (admittedly limited) requirements that the State must satisfy before taking property pursuant to the Special Procedure. A plain reading of these provisions reveals that, once the State obtains an approval from a state,

---

[10] The fact that due process does not guarantee a hearing to determine whether the State can proceed by an expedited process is, of course, a separate question from whether the provision of such a hearing remedies any inadequacies in the procedure actually provided.

9

federal or local governmental agency, board or commission, the State can file an acquisition map and gain title to the property at issue.

Moreover, other provisions of New York law clearly set forth the process by which such determinations may be challenged in an Article 78 proceeding. *See* CPLR §217. Plaintiff is not entitled to further "individualized notice of state-law remedies." *City of W. Covina*, 525 U.S. at 241. *See also Brody v. Village of Port Chester*, 2005 U.S. Dist. LEXIS 13, at *20-*21 (S.D.N.Y. 2005) (holding that the failure to delineate appellate procedures and the applicable statute of limitations did not render a condemnor's publication of its determination and findings constitutionally deficient).

### 2. Due Process Likely Does Require Notice Of The State's Decision To Use Municipal Approvals As A Basis For Exempting Itself From Article 2's Procedural Requirements

Plaintiff's claim to be entitled to notice of the State's intention to utilize municipal approvals to take Plaintiff's property by the special procedure is different in character than its other claims. As the court held in *Mullane*, "there can be no doubt that at a minimum…[the Due Process Clause] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." 339 U.S. at 313.

Although there is no simple formula for determining the nature of the notice required in any given case, it is beyond question that "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. As it currently stands, however, the EDPL allows the State to take property by a process that requires notice to be given to the property owner only at a stage in the process when it either has taken title to the property already or could immediately do so simply by filing papers with the county clerk. As such, an owner could, consistent with New York law, first learn that its property had been taken after the transfer of title was complete. Such a regime certainly does not, by definition, apprise a property owner "of the *pendency* of the action." *Mullane*, 339 U.S. at 314 (emphasis added).

Moreover, and as discussed, Supreme Court precedent confirms that property owners are entitled to some opportunity to be heard with respect to various issues, including whether a taking serves a public purpose and the amount of compensation, and in order to protect against an arbitrary and unjust appropriation.[11] Even leaving aside the issue of the nature of the hearing to which property owners are legally entitled, it is beyond dispute that no property owner could be heard without any notice that its property was being taken until the condemnation process is actually, or effectively, completed.[12] *See Mullane*, 339 U.S. at 314 ("The fundamental requisite

---

[11] Defendants' contention that property owners are entitled to notice and an opportunity to be heard only with respect to the issue of compensation is simply contrary to *State of Georgia*, *North Laramie Land* and other Supreme Court cases cited herein.

[12] The fact that Defendants may have given Plaintiff at least some notice of the State's interest in its property prior to the taking is of no moment here, for various reasons. First, this court understands Plaintiff to be making both facial and as applied challenges to the relevant provisions of the EDPL, and finds that the Plaintiff has demonstrated a likelihood of success on its claim that the EDPL's failure to require notice of its intention to use the Special Procedure renders the EDPL unconstitutional on its face. In any event, although Defendants may have given Plaintiff a pamphlet outlining, in general terms, the Special Procedure (as well as other indications that its property

of due process of law is the opportunity to be heard...[but] [t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.") (internal citation omitted).

For these reasons, Plaintiff has demonstrated a likelihood of success on at least one of its due process claims.[13]

### III. Conclusion

For these reasons, Plaintiff's motion for a preliminary injunction is GRANTED.
It is so ordered.

Dated: White Plains, New York
~~May 3, 2005~~
June 2, 2005

Stephen C. Robinson, U.S.D.J

---

might be taken), there is nothing to indicate that Defendants gave notice of its actual, final decision to take Plaintiff's property by the Special Procedure.

[13] Of course, this opinion makes no judgment as to whether or not the EDPL's Special Procedure is constitutionally deficient in any ways not specifically raised by Plaintiff in this motion.